*FOR PUBLICATION*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

In re Saint Vincent's Catholic Medical
Centers of New York, <u>et al.</u>

                                Debtors.

Chapter 11

Case No. 10-11963

Jointly Administered

------------------------------------------------------------ X

Michael E. Katzenstein, in his capacity
As the MedMal Trust Monitor,

                               Plaintiff,

v.

VIII SV5556 Lender, LLC,

                               Defendant.

Adv. P. No. 10-03281

------------------------------------------------------------ X

MEMORANDUM DECISION GRANTING IN PART
DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
AND GRANTING IN PART PLAINTIFFS' CROSS-MOTION
<u>FOR JUDGMENT ON THE PLEADINGS</u>

**Appearances:**
Richard Kanowitz, Jeffrey Cohen, Seth Van Aalten
Cooley LLP
for Michal Katzenstein in his capacity
as the MedMal Trust Monitor of the MedMal Trusts
(the "MedMal Monitor" or the "Monitor)

David Botter, Sarah Schultz, Joseph Sorkin
Akin Gump Straus Hauer & Feld
for the Committee of Unsecured Creditors
(the "Committee")

Richard Levin, Michael Paskin
Cravath , Swaine & Moore
for VIII SV556 Lender, LLC
(the "Creditor" or the "Secured Creditor")

The Creditor filed a proof of claim for about $46 million, representing the amount owing at the time the case was commenced, plus an "acceleration indemnification" described in a mortgage (the "Acceleration Indemnification"), attorney fees and costs, and default interest.  The MedMal Trust Monitor and the Committee commenced an adversary proceeding against the Creditor, seeking to limit the Creditor's secured claim to the amount owing at the time the present bankruptcy case was commenced, about $39.6 million.  Pursuant to the authority set by the Second Circuit in *United Merchants and Manufacturers, Inc.* and the clear and unambiguous agreements dated on or about August 30, 2007, the Court allows the Creditor a secured claim of $42.5 million, representing the $39.6 million owed at the time the case was commenced, the Acceleration Indemnification, attorney fees, and interest at the regular, nondefault contract rate up to the date of the sale of the property commonly referred to as Staff House (the "Property").[1] The Creditor may file a proof of claim for a general unsecured debt, representing the deficiency.

**Facts:** Debtors commenced their first bankruptcy cases on July 5, 2005, and the cases were consolidated.  The MedMal Trusts were created to protect the interests of the victims of medical malpractice, who ordinarily are general

---

[1] The Property's address is 555 Sixth Ave., New York, NY 10011.

unsecured creditors, ranking low in the scheme of priorities established by the Bankruptcy Code. As part of the chapter 11 plan in Debtors' first bankruptcy case, three secured loans held by Sun Life Assurance Co. of Canada ("Sun Life") were refinanced in the amount of $42.4 million. The transaction was governed by a note with a date of disbursement of August 30, 2007 (the "Note") and the mortgage dated August 30, 2007 (the "Mortgage") (together, the "Loan Documents"). Paragraph 10.21 of the Mortgage provides in relevant part (the "Cap Clause"):

> ● "Maximum Principal Indebtedness. Notwithstanding anything to the contrary contained herein, the maximum amount of the principal indebtedness secured by this Mortgage or which under any contingency may become secured hereby at any time hereafter is $42,500,00.00, plus all amounts expended by Lender following a default hereunder, to maintain the priority of the lien of this Mortgage or to protect the property encumbered by this Mortgage, or the value thereof, including, without limitation, all amounts in respect of insurance premiums and real estate taxes. <u>Furthermore, any increase in said principal indebtedness in excess of the foregoing, shall not be made without the consent of the holders of the Subordinate Mortgages</u>." (emphasis added).

The last sentence appears to state that the consent of the MedMal Monitor would be required to increase the secured principal indebtedness above $42.5 million.

Paragraph 10 of the Note provides for a penalty upon prepayment "for any reason." In Paragraph 11 of the Note, the Debtor agrees to pay an acceleration indemnification, if the Lender accelerates the maturity date because of the occurrence of an Event of Default.

Paragraph 15 of the Note provides: "Upon any Event of Default, Borrower shall pay all costs incurred by Lender in the course of collection of sums due under

this Note or in enforcing any of Borrower's other obligations under the Loan Documents, including, without limitation, reasonable attorneys' fees and expenses, whether or not suit is filed by Lender."   Paragraph 4.6(f) of the Mortgage provides that the Borrower shall indemnify the Lender for, among other costs, reasonable attorneys fees and disbursements incurred by the Lender in connection with "any act or omission of Lender under any Lease or under the Loan Documents as a result of Lender's exercise of rights or remedies under Paragraph 8.2 [Events of Default] or under any of the other Loan Documents."

Debtor filed the present bankruptcy case on April 14, 2010, its second bankruptcy case. Creditor purchased Sun Life's interest in the Staff House Note and Mortgage on April 27, 2010. Creditor filed the proof of claim for $46 million (the "Claim") on May 10, 2010.  Creditor and Debtor entered a bid on the Property dated June 14, 2010, in which Creditor agreed to pay $50 million, against which it could set off the amount of its allowed secured claim. The Debtors eventually sold the Property to SP 555 Sixth LLC (the "Buyer") for $67.34 million.

The Claim is comprised of about $39.5 million in outstanding principal; $89,159 in prepetition interest from April 1, 2010, to April 14, 2010; and the Acceleration Indemnification fee, default interest, and expenses.   The Claim represents a debt secured by a first mortgage on the Property.

On June 7, 2010, the MedMal Monitor commenced an adversary proceeding, challenging the amount of the Claim.  The Monitor argues that the Claim should be limited to about $39.5 million, the outstanding current principal indebtedness; and that in any event the Claim should be capped at $42.5 million pursuant to the plan of reorganization from the bankruptcy case.  It is undisputed that the outstanding current principal indebtedness at the time of oral argument was about $39.6

million.[2]  It appears that Plaintiff challenges the allowance only of the acceleration indemnification fee, default interest, and expenses.  Plaintiff argues that the disputed charges are unreasonable pursuant to 11 U.S.C. § 506(b), are the product of illegal *ipso facto* clauses pursuant to Bankruptcy Code §§ 365(e)(1) and 541, and violate the stay.

The Creditor filed a motion for judgment on the pleadings.  Creditor alleges that Debtor's filing the bankruptcy was an "Event of Default" pursuant to the Mortgage, which entitles it to the Acceleration Indemnification Fee, default interest, and expenses.  The Creditor argues that default penalties are proper because the agreements are not executory contracts, which would be restricted by rules regarding *ipso facto* clauses.  The Creditor argues that the $42.5 million cap is for the principal balance only, and does not limit the interest, penalties and fees that might accrue pursuant to the terms of the agreements.

### *Statement of Jurisdiction*

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984.  This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(B), because this matter concerns the allowance of a claim.

### *Standard on a Motion For Judgment On The Pleadings*

Defendant moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), which is made applicable to this adversary proceeding pursuant to Fed. R.

---

[2] The original loan amount was $28.5 million.  The Creditor acquired the Claim from Sun Life Assurance Co. of Canada, the original lender, for the amount of the current principal indebtedness, $39.5 million.  According to the Creditor's motion for judgment on the pleadings, the Claim represents a refinancing of three secured debts, in a reduced total amount of $42.5 million.  During the pendency of this motion, the amount increased from about $39.5 million to about $39.6 million.  The parties appear to agree on the principal balance.

Bankr. P. 7012(b).  Fed. R. Civ. P. 12(c) provides, "Motion for Judgment on the Pleadings. After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  In deciding a Rule 12(c) motion, courts apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party. Accordingly, judgment on the pleadings is appropriate if, from the pleadings, material facts are undisputed and the moving party is entitled to judgment as a matter of law." *See* Creditor's Motion for Judgment on the Pleadings, 9.

"[The court] should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  Consideration is limited to the factual allegations in plaintiff's amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit." *Faconti v. Potter*, 242 Fed. Appx. 775 (2d Cir. 2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face"); *McClelland v. Grubb & Ellis Consulting Services Co.*, 418 B.R. 61 (Bankr. S.D.N.Y.) (Morris, Bankr. J.) (in adversary proceeding by debtor against appraiser, court took judicial notice of fact that general unsecured creditors were paid 100 percent on their claims in the confirmed chapter 11 plan).

As on a motion to dismiss, the issue is not whether the plaintiff will prevail, but whether the plaintiff may present evidence to support the claims. The court must construe the factual allegations in the complaint liberally in favor of the plaintiff. The complaint must set forth sufficient information for the court to

determine whether some recognized legal theory exists to permit relief to the plaintiff. 2 Moore's Federal Practice, § 12.34 (Matthew Bender 3d ed.).

Plaintiff characterizes Creditor's effort to collect the full Claim as an effort to "reap a $7 million profit on a one-month investment." Plaintiff alleges that the $42.5 million cap was meant to preserve the value of the MedMal Trust.  Plaintiff notes that Creditor, the assignee of Sun Life, was not present at the time the Cap was created, and therefore is not in a position to opine about the parties' intent.

Plaintiff argues that § 506(b), allowing secured creditors "reasonable" fees and charges under their agreement, operates as a safety valve, prohibiting Creditor from collecting otherwise enforceable charges that are unjust to the estate and other creditors.[3]

Plaintiff summarizes the policy supporting denial of Creditor's acceleration charges: "Defendant should not be permitted to profit on a riskless investment at the expense of the hundreds of involuntary medical malpractice victims and other creditors who, unlike Defendant, have no realistic expectation of being made whole at the conclusion of this chapter 11 case."

## *Analysis*

It appears that the only Event of Default is Debtor's commencing the present bankruptcy case.  The Court holds that the contractual clauses that allow the acceleration indemnification fee, default interest, and expenses are allowed up to

---

[3] Bankruptcy Code § 506(b) provides:
   To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

the bargained-for cap of $42.5 million as secured claims; the Creditor may file an unsecured claim for the remainder.

"Under New York law a contractually agreed upon sum for liquidated damages will be sustained where (1) actual damages may be difficult to determine and (2) the sum stipulated is not 'plainly disproportionate' to the possible loss." *UM&M*, 674 F.2d at 142. The court should not consider proof of actual damages; rather, the court should consider the circumstances at the time the agreement was made. *See id.*

Creditor argues that the disputed parts of its Claim are allowed, because they represent liquidated damages that may be awarded pursuant to New York State law. Liquidated damages are set in the contract, and the court decides as a matter of law whether the liquidated damages clause is enforceable. Creditor alleges that the damages from a default on a long-term mortgage are not easy to calculate, and that the damages are not plainly disproportionate to possible loss. Creditor argues that the actual damages should not be considered.

Plaintiffs did not challenge the Acceleration Indemnification as an unenforceable penalty under New York State contract law.[4] Liquidated damages provisions similar to the measure of damages here, the "Discounted Yield Maintenance Fee," influenced by U.S. Treasury bills, have been upheld by New York bankruptcy courts. *See, e.g., In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122 (Bankr. E.D.N.Y. 2002) (Craig, Bankr. J.) (following *UM&M* to conclude that prepayment penalty was enforceable liquidated damages clause

---

[4] Debtor's first plan became effective in August 30, 2007, and the Note was set to mature in September 2014, about seven years later. The refinanced note was for $42.5 million. The building that secured the Note was appraised at $73.1 million in November 2005. *Joint Response and Cross-Motion of Michael E. Katzenstein, In His Capacity as the MedMal Trust Monitor, and the Official Committee of Unsecured Creditors to Defendant's Motion for Judgment on the Pleadings*, Exhibit B. The Court notes that in *UM&M*, the Second Circuit considered unsecured obligations from an agreement with a term of about 20 years.

under New York law); *Fin. Center Assocs. of East Meadow, LP, v. TNE Funding Corp. (In re Fin. Center Assocs. of East Meadow, LP)*, 140 B.R. 829 (Bankr. E.D.N.Y. 1992) (Holland, Bankr. J.).

### *Effect of acceleration*

"Upon acceleration the entire debt becomes due and owing. Acceleration moves the maturity date from the original maturity date to the acceleration date and that date becomes the new maturity date." *In re Solutia*, 379 B.R. 473, 484 (Bankr. S.D.N.Y. 2007) (Beatty, Bankr. J.). The Second Circuit recently ruled on what penalties properly may be awarded upon acceleration of a debt, in *Capital Ventures Int'l v. Republic of Argentina*, 552 F.3d 289 (2d Cir. 2009). Argentina defaulted on the payment of principal and interest on foreign debt, and plaintiff, the owner of foreign bonds, accelerated the bonds, making the principal immediately due. It appears that the court in *Capital Ventures* addressed the rights of a creditor that voluntarily accelerated the debt. With respect to the interest that the owner could collect, having accelerated the debt, the circuit court held that statutory prejudgment interest was properly awarded with respect to the contractual interest payments that Argentina failed to make before the acceleration, and the entire amount of the principal starting on the date of acceleration. The circuit court denied the plaintiff contractual interest payments that continued to come due after acceleration – in essence, the plaintiff was demanding statutory prejudgment interest on post-acceleration interest payments. The court stated, "The normal consequence of acceleration is that interest payments that would have been due in the future are no longer due, because, after acceleration, the entire principal is immediately due and owing; in other words, future interest payments are "unearned" because the creditor is no longer loaning the debtor the principal." *Id.* at 296.

The Creditor argues that the debt was accelerated automatically, upon the commencement of the present bankruptcy case. *See* Proof of Claim, VIII SV5556 Lender, LLC, ¶ 3 ("The voluntary petition constituted an Event of Default under Section 8.1(d) of the Staff House Mortgage, automatically accelerating the entire Secured Debt and making it immediately due and payable"). Plaintiffs argue that the Creditor voluntarily accelerated the debt, and therefore waived its right to the prepayment penalty.

The Court has examined the loan documents and finds that the acceleration of the debt was a voluntary act by the Creditor. It is clear from the Loan Documents that the acceleration of the debt was not an automatic event triggered by the commencement of the present bankruptcy case. The loan documents are replete with reference to the Lender's, and therefore the Creditor's, discretion in electing and pursuing its remedies:

● Paragraph 6 of the Note provides: "Borrower waives … notice of ***intention*** to accelerate the maturity of this Note … and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note …."

● Paragraph 11 of the Note provides in relevant part: "If the Maturity Date is accelerated ***by Lender*** because of the occurrence of an Event of Default, Lender will sustain damages due to the loss of its investment."

● Paragraph 16 of the Note provides: "The rights and remedies of lender are set forth in the other Loan Documents and include, without limitation, ***the right to declare*** the Secured Debt, including the principal balance of this Note and accrued interest, immediately due and payable in case of an Event of Default."

● Paragraph 8.2 of the Mortgage provides: "If an Event of Default has occurred and is continuing, ***Lender may, at any time thereafter, at its option***, without notice, and without bringing any legal action or proceeding unless expressly required by law … declare the entire Secured Debt due and payable, and it shall thereupon be immediately due and payable."

● Section 8.4(e) of the Mortgage provides: "Lender may resort to any remedies and the security given by the Loan Documents in whole or in part, and in such portions and in such order ***as may seem best to lender in its sole unfettered discretion*** .…"

● Section 8.4(h) of the Mortgage provides: "Unless specifically stated otherwise, Lender may exercise its options and remedies under any of the Loan Documents ***in its sole unfettered discretion*** .…"

Declaration of Laura R. Hall in Support of Defendant's Motion for Judgment on the Pleadings, Exhibits A, B (emphasis added) (hereafter, the "Hall Declaration").  The pervasive references to the Lender's, and therefore the Creditor's, discretion in enforcing its remedies pursuant to the Loan Documents indicates that the acceleration was a voluntary act committed by the Creditor.

The Creditor accelerated the debt when it filed its proof of claim.  The proof of claim indicates on its face that the amount of the secured claim is about $46 million.  Paragraph 3 of the statement accompanying the official form states, "The voluntary petition constituted an event of default under Section 8.1(d) of the Staff House Mortgage, automatically accelerating the entire Secured Debt and making it immediately due and payable."  Hall Declaration, Exhibit E, ¶ 3.  The Court disagrees with Creditor's characterization of the acceleration as automatic, but the intent to accelerate the debt is plain from Creditor's act of filing the proof of claim

and declaring the debt accelerated.   Section 8.2 of the Mortgage is satisfied by Paragraph 3 of the statement accompanying the proof of claim.   *Cf. In re LHD Realty Corp.*, 726 F.2d 327, 331 (7th Cir. 1984) (creditor exercised option to accelerate when it moved for relief from the stay, which was indication that it preferred accelerated payment over the opportunity to earn interest).

Having found that the acceleration was voluntary, the Court must determine whether the Creditor may file a secured claim for the acceleration indemnification. The Court allows the secured claim for the acceleration indemnification and attorney fees pursuant to the Second Circuit's authority set in *United Merchants & Manufacturers, Inc. v. The Equitable Life Assurance Society (In re United Merchants & Manufacturers, Inc.)*, 674 F.2d 134 (2d Cir. 1982) (hereafter, "*UM&M*").   In a case under the Bankruptcy Act, the Court allowed unsecured creditors the right to file claims for collection costs and liquidated damages, where their pre-petition loan agreements with the debtor provided for such claims.   "The validity of a clause in a loan agreement providing for recovery of collection costs upon default is determined by state law."   *UM&M*, 674 F.2d at 137.   The Second Circuit noted that the court below had considered secured creditors' being allowed such costs, and rejected the argument that the Act's policy of equitable distribution rendered a clause awarding costs unenforceable.   *See id.* at 137.   The appellate court found no distinction between secured and unsecured creditors.   *Id.*; *see also Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 451 (2007) (Alito, J.) ("Property interests are created and defined by state law, and unless some federal interest requires a different result, there is no reason why such interest should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); *Ogle v. Fidelity & Deposit Co. of Md.*, 586 F.3d 143 (2d Cir. 2009) (allowing creditor an unsecured claim for post-petition

attorneys' fees authorized by a pre-petition contract valid under state law and noting that *UM&M* survived the Supreme Court's holding in *Travelers*).

Plaintiffs rely on *In re LHD Realty Corp.*, 726 F.2d 327 (7th Cir. 1984), for the proposition that the Creditor waived its right to the Acceleration Indemnification, having voluntarily accelerated the debt. In *LHD Realty*, the court found that a secured creditor accelerated a debt when it moved for relief from the stay, and thereby waived its right to a prepayment penalty. The *LHD Realty* court cited the rule that prepayment penalties are waived when a loan is accelerated, because acceleration advances the maturity date, and payment therefore is made after maturity. *Id.* at 330-331.

*LHD Realty* has been rejected by New York bankruptcy courts as nonbinding authority contrary to *UM&M*. In *Financial Center Associates*, the bankruptcy court allowed a prepayment charge occasioned by the creditor's acceleration of the debt. The court noted, "[i]t is not disputed that the agreement between the parties specifically provides for the pre-payment charge even in the event of acceleration." *Fin. Center Assocs. of East Meadow, LP*, 140 B.R. at 835. The court rejected *LHD Realty* because that case did not concern an acceleration penalty. The court noted that in *UM&M*, the Second Circuit upheld a liquidated damages provision that was an acceleration penalty, which was exercised at the option of the creditor. *See UM&M*, 674 F.2d at 140. Similarly, in *Vanderveer Estates*, the bankruptcy court upheld a penalty for prepayment and acceleration, finding it to be a valid liquidated damages provision pursuant to New York law.

In the case at bar, it does not matter that the acceleration happened post-petition, upon the filing of the proof of claim. A claim is measured as of the petition date. The definition of a claim in bankruptcy is broad, encompassing contingent and unmatured claims. In the case at bar, the Acceleration Indemnification did not exist until the Creditor filed the proof of claim, but the

right to the Acceleration Indemnification was the result of pre-petition bargaining by equally sophisticated parties, during the Debtors' first bankruptcy case, and granted in the Mortgage. *See Ogle v. Fidelity & Deposit Co. of Md.*, 586 F.3d 143 (2d Cir. 2009) (creditor was permitted to file proof of claim for attorney fees associated with the bankruptcy, which were not incurred until after the case was commenced).

### *The disputed charges are allowable pursuant to Bankruptcy Code § 506(b)*

Plaintiffs argue that the Court should deny the Acceleration Indemnification and attorney fees pursuant to § 506(b).[5]  Plaintiffs argue that the disputed charges are unreasonable in light of the equities of the case – that the Creditor, having acquired the Claim from Sun Life, will turn a risk-free profit of $7 million, at the expense of the victims of medical malpractice, who by definition are present in this case against their will.

"At best we are willing to view the 'reasonable' standard of § 506(b) in the context of pre-payment clauses as a safety valve which must be used cautiously and sparingly as all discretionary powers that are not subject to close scrutiny and statutory standard.  The situation justifying invocation of this power is not easily definable." *Financial Center Assocs.*, 140 B.R. at 839 (declining to apply § 506(b) to reduce or disallow pre-payment); *see also In re Vanderveer Estates* (where acceleration occurred pre-petition, court concluded that § 502 governed, not § 506(b)).

---

[5] Bankruptcy Code § 506(b) provides: "To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section [referring to right of trustee to recover from the collateral the costs of preserving the collateral], is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."

In the matter at bar, the Court cannot find that the Acceleration Indemnification and other charges are valid pursuant to § 502 but not § 506(b). If the Court were to accept Plaintiffs' argument, then § 502, *UM&M* and the underlying jurisprudence would be thwarted. Plaintiffs admit that the Cap Clause was "heavily negotiated" over a period of several months. *Joint Response and Cross-Motion of Michael E. Katzenstein, in His Capacity as the MedMal Trust Monitor, and the Official Committee of Unsecured Creditors to Defendant's Motion for Judgment on the Pleadings*, July 22, 2010, 2, 5-6. The Court will not use the benefit of hindsight under the guise of § 506(b) to disturb a liquidated damages clause in a contract negotiated by sophisticated parties.

The Court awards interest at the non-default rate. Creditor argues that it is entitled to post-petition interest because it is over-secured, and that the interest rate should be the default rate, or at least the pre-petition, nondefault rate of interest. In *Solutia*, the court allowed principal, pre-petition accrued original issue discount, and pendency interest. With result to pendency interest, the *Solutia* court stated, "During the pendency of the Chapter 11 cases, the 2009 Noteholders have been entitled to pendency interest. Pendency interest must be paid on secured claims but need not be paid at the contract rate." *Solutia*, 379 B.R. at 486. The Court has well-established authority to award over-secured post-petition interest at the non-default rate. *See In re Vest Assocs.*, 217 B.R. 696 (Bankr. S.D.N.Y. 1998) (Brozman, Bankr. J.).

### *The charges are subject to the cap of $42.5 million*

Principles of New York contract law guide the Court in this dispute: "(1) the intent of the parties governs; (2) a contract should be construed so as to give full meaning and effect to all of its provisions; (3) words and phrases in a contract

should be given their plain meaning; and (4) ambiguous language should be construed against the interest of the drafting party." *See Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (citation and quotation omitted). The determination "whether a contract provision is ambiguous is to be made by the court as a matter of law." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002). "This determination is made by examining the face of the agreement itself, without considering extrinsic evidence." *Id., citing Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir.2002) (construing New York law). The Court must construe the parties' intent in light of all of the provisions of the agreement in question, together with any related agreements entered into concurrently. A contract is not ambiguous merely because the parties offer different constructions of the same term. *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993). Upon the foregoing, it is well-settled that the agreement must be construed in its entirety before the Court may find that a single provision is ambiguous.

The Cap Clause limits "the maximum amount of the principal indebtedness secured by this Mortgage" to $42.5 million. "Principal indebtedness" is not defined in the Mortgage. Creditor alleges that the Acceleration Indemnification is not subject to the Cap Clause, because the Acceleration Indemnification is not principal. Creditor points out that a defined term of the Mortgage, "Secured Debt," includes prepayment penalties. Creditor argues that the parties could have used the term "Secured Debt" if they wanted to limit the Acceleration Indemnification to $42.5 million. Plaintiffs allege that the parties negotiated the Cap Clause to protect the value of the lien of the MedMal Trust. Plaintiffs argue that Creditor's construction of the Cap Clause would frustrate the intent of the parties.

The Court rejects Creditor's argument that the Acceleration Indemnification, interest and other portions of its claim are not subject to the Cap Clause. The

secured claim of a creditor traditionally includes damages. The Second Circuit stated in *UM&M*, "Section 506(b) ... codifies pre-Code law that an *over-secured* creditor can assert, *as part of its secured claim*, its right to interest and costs arising under its credit agreement." *Id.* at 138 (emphasis added). The Court is aware that *UM&M* was a case under the Act, but the Second Circuit's statement of the regular rule regarding secured claims is useful to the Court in construing the clause setting the $42.5 million cap. *See Capital Ventures Int'l*, 552 F.3d at 297 ("In the absence of ambiguity or a provision in the [agreement] specifying otherwise, acceleration should be given its normal meaning"). If the contract is unambiguous, the terms should be given their plain and ordinary meanings. The *UM&M* court stated that the claim of an oversecured creditor ordinarily includes interest and costs as the secured claim. *See UM&M; In re Levy's Estate*, 70 N.Y.S.2d 72, 77 (N.Y. Surr. 1947) ("The collateral in the possession of the creditor was collateral to the payment of the whole debt and from and after the demand the whole debt included the interest in the nature of damages").

The Cap Clause describes two kinds of debt: the secured principal indebtedness limited to $42.5 million, and amounts expended to protect the mortgage and the property. These categories may be described as limited secured debt and unlimited secured debt. "Principal indebtedness" is not defined in the Mortgage or the Cap Clause, but the Cap Clause contains a detailed description of the amounts not subject to the Cap, the amounts expended to protect the mortgage and the property. Creditor's attempt to parse a third, implied category of debt, the default penalties, into the description of unlimited debt is too nuanced to survive the rule that terms in contracts should be given their plain meaning.

Creditor's argument that the parties could have used "Secured Debt," is undermined by the use of other non-defined terms in the Cap Clause, which indicates a general abrogation of the Mortgage's defined terms. For example,

"Property Taxes and Charges" is a defined term in the Mortgage, and would provide the Lender and the Creditor with far greater protection than the ordinary term "real estate taxes," which was actually used. The Court takes judicial notice of the docket in the underlying bankruptcy case, and notes that the sale of the Property was initially challenged by New York City, which asserted a first-priority statutory lien for unpaid water and sewage bills. *Case No. 10-11963, Docket No. 433.*    Additionally, the Cap Clause refers to "insurance premiums," without indicating that "Insurance Premiums" is a defined term described at length in Paragraph 4.3 of the Mortgage. Finally, the Cap Clause states, "plus all amounts expended by Lender following a default hereunder;" the Mortgage consistently uses the term "Event of Default" elsewhere in the document. The Court notes the same inconsistencies in the 2004 mortgage agreement, from which Creditor alleges part of the Cap Clause was copied. The drafting of the Cap Clause as a whole persuades the Court that it should not strictly adhere to the list of defined terms.

"Agreements should not be interpreted in a way that renders any of the provisions superfluous or meaningless." *In re Vanderveer Estates*, 283 B.R. at 130-131. Creditor's argument would render the Cap Clause superfluous, because the only way the principal indebtedness could increase was the addition of interest and default penalties. The Loan Documents make no mention of future loans that might be secured by the Mortgage, but the Loan Documents are packed with descriptions of events of default, damage penalties, and demands such as the kind of insurance the Debtor was required to obtain.

The Acceleration Indemnification does not fit the description of the charges that are excluded from the Cap. The charges that are not subject to the cap are expressly described in the clause: "plus all amounts expended by Lender following a default hereunder, to maintain the priority of the lien of this Mortgage or to protect the property encumbered by this Mortgage, or the value thereof, including,

without limitation, all amounts in respect of insurance premiums and real estate taxes." The Acceleration Indemnification is not a specific amount expended by the Lender or the Creditor. It does not affect the priority of the mortgage, and does not protect the property or its value. The Acceleration Indemnification represents liquidated damages, and was triggered by an Event of Default unrelated to waste or neglect of the property. It does not fit the description of the kind of claim that is not subject to the Cap.

Further, the attorneys' fees accrued with respect to the present adversary proceeding are subject to the cap. Creditor has had to defend the present challenge to its proof of claim, but it has not had to defend the priority of the Mortgage, or to protect the property or its value. A claims objection is a different legal proceeding than that contemplated by the above-cited clause.

Therefore, the Court construes the Cap Clause to mean that the amount secured by the mortgage and limited by the Cap includes interest, costs and penalties. The Creditor has a secured claim of up to $42.5 million, which includes the amount owing at the time the case was commenced, interest, attorney fees, and the Acceleration Indemnification; if these debts exceed a total of $42.5 million, then the Creditor may file a non-priority unsecured claim for the difference.

### ***The Loan Documents do not include prohibited* ipso facto *clauses***

Plaintiffs allege that the only Event of Default was the filing of the present bankruptcy cases, and that the provisions of the Loan Documents that allow Creditor to recover penalties for Debtor's commencing a bankruptcy case are unenforceable *ipso facto* clauses, pursuant to Bankruptcy Code §§ 365(e)(1) and 541(c)(1)(B). Plaintiffs urge the Court to follow *In re Texaco Inc.*, 73 B.R. 960 (Bankr. S.D.N.Y. 1987) (Schwartzberg, Bankr. J.) and find that the Loan Documents are executory contracts, and therefore are subject to the prohibition

against *ipso facto* clauses set out in Bankruptcy Code § 365(e)(1).[6]  In *Texaco*,
Chase, as holder and indenture trustee of debtor's securities, moved for relief from
the stay so that it could serve a notice of acceleration of the securities.  Chase
alleged that the event of default that permitted acceleration was debtor's
commencing its bankruptcy case, pursuant to the indenture.  The court listed the
continuing obligations of each party under the indenture, and determined that the
agreement was an executory contract.  Therefore, the court held that the default
provision was an unenforceable *ipso facto* clause pursuant to § 365(e)(1)(B).
*Texaco*, 73 B.R. at 965.  Movants were unsecured creditors, and failed to establish
cause for relief from the automatic stay.

   *Texaco* is distinguishable from the case at bar, because the creditors in
*Texaco* were unsecured creditors, and in the case at bar, the Creditor is a secured
creditor.  Generally, mortgages are not executory contracts.  The *Countryman*
definition of an executory contract is ""a contract under which the obligation of

---

[6] Bankruptcy Code § 365(e)(1) provides:

   Notwithstanding a provision in an executory contract or unexpired lease, or in applicable
   law, an executory contract or unexpired lease of the debtor may not be terminated or
   modified, and any right or obligation under such contract or lease may not be terminated
   or modified, at any time after the commencement of the case solely because of a
   provision in such contract or lease that is conditioned on—
   (A) the insolvency or financial condition of the debtor at any time before the closing of
   the case;
   (B) the commencement of a case under this title; or
   (C) the appointment of or taking possession by a trustee in a case under this title or a
   custodian before such commencement.
   (2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired
   lease of the debtor, whether or not such contract or lease prohibits or restricts assignment
   of rights or delegation of duties, if—
   (A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from
   accepting performance from or rendering performance to the trustee or to an assignee of
   such contract or lease, whether or not such contract or lease prohibits or restricts
   assignment of rights or delegation of duties; and
         (ii) such party does not consent to such assumption or assignment; or
   (B) such contract is a contract to make a loan, or extend other debt financing or financial
   accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re N. Am. Dealer Grp., Inc.*, 16 B.R. 996, 1000 (Bankr. E.D.N.Y. 1982) (noting that Prof. Countryman excluded mortgages from his definition of an executory contract). The Court has examined the list of Creditor's obligations described by Plaintiffs, and finds that none of these obligations are so material that a breach would excuse Debtor's obligation to perform. Therefore, the Loan Documents are not executory contracts under the traditional *Countryman* definition, and § 365(e)(1) does not apply.

The Court concludes that § 541(c)(1)(B) does not invalidate the clause including commencing a bankruptcy among the events of default.[7] The collateral unquestionably came into the bankruptcy estate. Indeed, the Court approved its sale after the standard bankruptcy process. The question is how much the Creditor may recover from the sale on account of its first-priority mortgage, not whether the collateral is property of the estate. Further, the Court is persuaded by *Frank's Nursery and Crafts*, 2006 Bankr. LEXIS 1964) (Bankr. S.D.N.Y. May 8, 2006) (Bernstein, Bankr. J.), where the bankruptcy court enforced a provision in a secured loan agreement that provided for a penalty upon the filing of a bankruptcy. A term sheet that was the basis of the loan agreement was an integral part of the

---

[7] Bankruptcy Code § 541(c)(1)(B) provides:
> (1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—
> (A) that restricts or conditions transfer of such interest by the debtor; or
> (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.
> (2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

debtor's first confirmed plan of reorganization; the debtor subsequently attacked the provision as unenforceable pursuant to § 541(c)(1)(B), and the bankruptcy court upheld the provision.

### *Miscellaneous grounds for relief*

On its motion for judgment on the pleadings, Creditor argues that Plaintiff's claims for champerty and barratry, "books and records," and its own purchase price for Sun Life's interest do not require the disallowance of the Claim. Plaintiff has not responded to this argument. The Court grants Defendant's motion for judgment on the pleadings with respect to these causes of action.

### *Acceleration did not violate the stay*

In its motion for judgment on the pleadings, Creditor seeks judgment on the cause of action in the Complaint for a violation of the stay. Creditor argues that filing a proof of claim is not a violation of the stay. Plaintiffs failed to respond to this aspect of the Creditor's motion, other than to reserve its rights to argue that "[d]efendant's enforcement of the *ipso facto* clause of Section 8.1(d) of the Staff House/Sun Life Mortgage constitutes a willful, malicious and bad faith violation of the automatic stay." The Court grants judgment in favor of Creditor.

A claim is defined in the Bankruptcy Code as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Bankruptcy Code § 101(5)(A). "A contingent claim under the Code refers to obligations that will become due upon the happening of a future event that was within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *Ogle v. Fidelity & Deposit Co. of Md.*, 586 F.3d 143, 146 (2d Cir. 2009). "A claim will be deemed to have arisen pre-petition if the relationship between the debtor and the creditor contained

all of the elements necessary to give rise to a legal obligation – a right to payment – under the relevant nonbankruptcy law." *Id.*   In *Ogle*, the Second Circuit construed the United States Supreme Court's decision in *Travelers* to mean that § 502(b)'s requirement that the court determine the amount of a claim as of the filing date does not bar recovery of post-petition attorneys' fees. *Id.* at 147.

The Mortgage clearly indicates that a default was within the contemplation of the parties at the time the Loan Documents were made, because the Mortgage contains a long list of Events of Default and remedies, and detailed calculations for a prepayment penalty and the Acceleration Indemnification.  As noted above, the Plaintiffs do not challenge the validity of the Acceleration Indemnification pursuant to New York law.  Plaintiffs argue that the Acceleration Indemnification is unreasonable pursuant to § 506(b), not unenforceable pursuant to § 502.  For purposes of this discussion, the Court will assume that the requirements of New York law for granting the rights to accelerate the debt and collect the Acceleration Indemnification are met.

Generally, a creditor must seek relief from the stay in order to serve a notice of the acceleration of a debt.  "[A] creditor is allowed to file a proof of claim for the full amount of an unmatured debt owed by the debtor, however, the automatic stay prevents the creditor from taking any overt steps to accelerate the debt." *In re Payless Cashways, Inc.*, 287 B.R. 482 (Bankr. W.D. Mo. 2002); s*ee also In re PCH Assocs.*, 122 B.R. 181, 198 ("Courts have made a distinction between acceleration of a debt upon the filing of the bankruptcy petition for the purpose of the filing of a proof of claim in a case, and acceleration for the purpose of taking actions against a debtor in violation of the automatic stay.").

In the case at bar, the Loan Documents provided that service of a notice of intent to accelerate the debt was not necessary.  The Creditor filed a proof of claim for the full amount of the debt, including the Acceleration Indemnification.

Creditor accelerated the debt when it filed the proof of claim, and did not violate the stay by filing the proof of claim. If the Court were to find that accelerating the debt by filing the proof of claim violated the stay, it would leave creditors no option to file proofs of claim for unmatured or contingent debts, even where the agreement provides that no notice is required for acceleration and a penalty is payable upon acceleration. Further, in filing the proof of claim, the Creditor did not seek to collect or enforce the debt – it put the matter before the Court, and left for the Court to decide whether the Claim would be paid. The Court notes that the parties to the Loan Documents were equally sophisticated – the Lender, the Debtor, and the MedMal Trust – and the Acceleration Indemnification constitutes a contingent claim bargained for in that transaction.

### *Conclusion*

The Creditor has a secured claim up to $42.5 million, pursuant to the Cap Clause, and the Acceleration Indemnification is subject to this clause. The Acceleration Indemnification is allowed pursuant to Bankruptcy Code § 502(b), and it is reasonable pursuant to § 506(b).

Creditor's attorneys' fees may be allowed pursuant to the Loan Documents. To the extent that the Court finds that the attorneys' fees are allowed pursuant to Bankruptcy Code § 502(b) and reasonable pursuant to § 506(b), they are secured subject to the Cap Clause. It is impossible for the Court to decide at this time whether the attorneys' fees are within the description of the fees that may be awarded pursuant to the Loan Documents. The Court has been offered no evidence of Creditor's attorneys' fees. Within 28 days of entry of an Order consistent with this Decision, Creditor shall file a statement or affidavit in the nature of a fee application in support of its proof of Claim for attorneys' fees, on

notice to the Plaintiffs.  Plaintiffs shall have 14 days from the date of filing of the fee application to review and challenge the application.

Plaintiff may have interest at the non-default rate pursuant to § 506(b).

Creditor did not violate the stay when it filed its proof of claim.

After Plaintiff's 14-day period to review and challenge Debtor's attorney fees and any related hearings have passed, Plaintiff may have 28 days to amend its proof of claim in a manner consistent with this Decision.

Counsel to Creditor shall submit an order consistent with this Decision.


Dated:      November 12, 2010
            Poughkeepsie, NY


                                        /s/ Cecelia Morris
                                        U.S. Bankruptcy Judge